Today's appeal presents a somewhat unusual circumstance. Any decision by this court may directly affect every member of not only the Federal Circuit, but of the entire Federal Judiciary. To some of us this is more than unusual, it's a little uncomfortable. Yet the Supreme Court has stated that under the rule of necessity, we have a duty to decide cases involving judicial compensation in spite of any potential personal interest. The rule of necessity states, quote, although a judge had better not, if it can be avoided, take part in a decision of a case in which he has any personal interest, yet he not only may, but must do so if the case cannot be heard otherwise. These appellants have brought a cognizable claim and are entitled to their day in court, as noted by perhaps the greatest American judge, Chief Justice John Marshall in 1821, that judiciary, unlike the legislature, does not have the luxury of inaction when faced with difficult decisions. Whatever difficulties a case may bring, quote, we have no more right to decline the exercise of jurisdiction which is given than to usurp that which is not given. Close quote. It is under this mandate that we sit and hear this case today. Mr. Landau, you may proceed. Thank you, Chief Judge Rader, and may it please the Court. I'm Chris Landau, and I'm here today on behalf of the appellants. I'd like to reserve ten minutes for rebuttal. This case turns on a simple principle. While Congress need not keep all of its promises, it needs to keep its promises of compensation to Article III judges. The Compensation Clause of Article III provides that a judge's compensation shall not be diminished during his continuance in office. That means, as Hamilton said, that Congress can't change a judge's condition for the worse. When Congress makes a definite and precise promise of future compensation to federal judges, it can't thereafter diminish that compensation. Eleven years ago, however, a divided panel of this Court held in Williams v. United States that the compensation protected by Article III is strictly limited to amounts due and payable to a judge, and doesn't extend under any circumstances to future judicial pay promised by law, no matter how precise and definite the promise. Is your test that you're proposing one that turns on the definiteness of the promise, or the definiteness of the expectations created by the promise? I think, Judge O'Malley, those two are very related. You can't have firm expectations if the promise isn't firm. So, you need a firm and definite promise to give rise to reasonable expectations that the promise will be fulfilled. And that's the real critical point that, with all respect, we think that the Williams panel missed. They believe, that panel, the majority there, that the result in this case, or the result in the Williams case, which involved the same statutory regime as this case, was dictated by the result in Will, the Supreme Court's prior decision. The fundamental difference between the Will case on the one hand, and this case in Williams on the other hand, is that there was no firm and definite promise in Will that judges would get any kind of future compensation, and therefore no reasonable expectations. Whereas in this case, we have a different statutory regime. In fact, a statutory regime that was a repudiation of the statutory regime that was enacted, that was at issue in Will. But the problem, Jolanda, seems to me, is you're trying to distinguish Will on its facts. And the Supreme Court has told us on many occasions that a subordinate federal court is bound by the Supreme Court's reasoning and holding, and that it's not up to us to distinguish away their cases based on factual differences. How do you deal with that? Your Honor, it is certainly true that the lower courts cannot overrule the Supreme Court's cases. But that doesn't mean that you have to overread their cases. And I guess the road map, the key point here, is that when the Williams case went up to the Supreme Court, there was a dissent from denial of cert by Justice Breyer, joined by Justices Scalia and Kennedy. And they didn't say, we need to overrule Will. They said, Will can be distinguished. Well, that they can do as the Supreme Court. But what case suggests that we as a subordinate federal court can depart from the reasoning of the Supreme Court and essentially confine a case to its facts? Well, Your Honor, again, I think the cases that we say in our briefs, like Illinois v. Lister and Rider v. Sonotone, stand for the proposition that I think you all as judges realize you have to do every day, which is, even though you can't overrule the Supreme Court's cases, you have to, as a judge, exercise your judgment to try to figure out how broad or how narrow the holding is. And the Supreme Court does not have a holding that is broader than the situation before it, as Justice Breyer put it in that. It doesn't. I'm sorry? That that's not an appropriate way to proceed. Well, Your Honor, again, but I think it's important when you're looking at the reasoning to look at the context in which the reasoning was set forth and at the questions that were actually presented to the court in that case. And again, this is somewhat of a metaphysical question, I guess, and I think we have guidance from three members of the Supreme Court, at least, and I realize that that's not a majority. But you also have a very significant hint, it seems to me, and this is from a majority of the Supreme Court, is in the fact that the court remanded this very case. I mean, this case, as you know, was in the Supreme Court previously. The court remanded the case for consideration of the preclusion issue. Well, that would have been a very strange thing if this court's hands were absolutely bound and we were bound to lose as a matter of law under will. The court would have essentially been asking for an advisory opinion, and the remand order had a particular sentence that went out of its way to say that further proceedings are for the court of appeals to decide in the first instance. So, in a sense, the Supreme Court was inviting— Well, that doesn't indicate the result. That just indicates the appropriateness of going beyond the preclusion issue. Well, that's correct, Your Honor, but it would be a tad strange, to say the least, if the result were preordained. I mean, I think the Supreme Court— In other words, they would have denied truth. Correct, or it would have been just strange if will absolutely controlled this, and you all had no discretion. You were absolutely bound by will. They would have essentially been remanding for an advisory opinion and sending you all on a fool's errand. And I don't think the court— Is there anything about the reasoning in will itself that supports your conclusion that will should be read more narrowly than the Williams court read it? Your Honor, again, I think what I could say is that you have to understand the reasoning in will in light of the context in will, but the context of a precise and definite—of a very imprecise regime that was overturned by the subsequent enactment. So there is certainly some language in will that is favorable to the government's position here. But what I'd say furthermore, if you were to say, look, I'm sorry, we're a lower court. We're absolutely bound by will. You would be reading will in such a way to have dramatic consequences that it would be very strange to think that the Supreme Court would have done unanimously, in that opinion, by Chief Justice Berger, for instance, with respect to retirement pay. As we've argued here, one of the key points is that if you take the government's theory, you take that one sentence on page 229 of will, that compensation vests only when it becomes due and payable. Certainly, judicial retirement pay is not due and payable currently. It's not due and payable until a judge meets the vesting conditions set forth in 28 U.S.C. 371, which are the rule of— I'm sorry? What do you read out of the fact that the will court said what it was doing was allowing Congress to change a formula? The will characterized it really as an issue of a formula. And again, I think that's because—and maybe this goes to your earlier question, Your Honor—in will, there was no underlying promise. It was really a question about a formula. This is a question about a promise. In other words, this is much more than a formula. This is something, when you put together the 1989 Act, 28 U.S.C. 461, which is about judicial pay, with 5 U.S.C. 5303, which is about the general schedule pay, those together create a very precise and definite promise. It was precise as to amount of pay and to the fact that you will get it automatically. That was the whole point of the 1989 statute. Let me see if I understand your position with respect to the point you're making now, the link between the GS pay and the judges' pay. As I understand it, the judges' pay is in fact linked to the GS pay under the statute, the 1989 statute. And I take it your position is that if Congress should decide to reduce the formula for the GS employees and the judges were reduced to the same extent with respect to the cost of lending increases, there would be no compensation clause violation. Is that right? No, Your Honor. So you think that the tie is there only under the current formula? Yes, Your Honor. So if, for example, I suppose Congress should decide that the employment, the ECI, was really overcompensating GS employees and judges, for that matter, and decided to go, say, to the CPI and had a statute that says we're changing it to the CPI, that the judges would, assuming the CPI produced lower results, the judges would be entitled to have their COLAs calculated under the ECI for all time? Yes, Your Honor. No, well, they could change it and then new judges wouldn't necessarily have that expectation. But for all time, for all judges in place? For all then sitting judges, the answer is yes. That's the way it works. In other words, again, this isn't… So they can't repeal the 1989 Act, even if they repeal the whole thing and went to a different system for GS compensation, that would still be a violation of the compensation clause? Yes, Your Honor, because this was the promise that was set forth in 1989, and it's still the promise to this day, that the 1989 Act remains on the books. And that was the deal that was done in 1989. And this wasn't some kind of accident or happenstance, the way those two clauses work together. The 1989 statutory regime was the result of years and years of study and dissatisfaction with the very regime that was at issue in Will, about federal employees, both at the general schedule level and also senior executive service and judges, having to go back to Congress year after year. And they said, you know something, this isn't working. They used to have this whole Rube Goldberg regime, where you had an agent who had to then have a reviewing commission, go to the president and have a one-house veto. That's not working. What we're going to do is we're going to put severe restrictions on the ability of judges to earn outside income. And this is all part of the deal that was reflected in the 1989 statute, but we're going to give judges self-executing and automatic COLAs. That is entirely different than the regime that was at issue at Will. But you're not saying that individuals had a contract with Congress? No, I think that's right, but I think the question… The deal is historically accurate, but there's no contract. Well, I think that's right, but I think in a sense the compensation clause is a contract between the judiciary and Congress. It says Congress, you know, for Winstar kind of cases, you might actually need a contract, but I think what we're talking about here is what's set forth in the compensation clause itself by the founders, who, again, I just think we have to look back to what is the illuminating principle here. It's Hamilton's principle that Congress shouldn't be able to change the judge's condition for the worst. Well, that, of course, raises the question, well, what is the judge's condition? Is it just what the judges have heretofore received, what has become due and payable, or can Congress, does Congress have the power to say, look, we don't have to do an indexing scheme for judges, but we're going to do an indexing scheme for judges, and we're going to give it to judges in precise and definite terms. Could Congress repeal the 89 Act? It couldn't repeal the 89 Act insofar as it gave pay increases to judges, no, because that was the deal. Could it repeal it in the future? That is, could it say, for example, judges can go out and earn outside income, we're repealing the entire Act? Well, Your Honor, that raises an interesting question, whether or not Congress could come up with an alternative regime that, in a sense, didn't wind up lowering the real compensation to judges. I think that's a very interesting question, but I think you would certainly have to look for what is the compensating mechanism. For instance, to go back to an earlier hypothetical. Wasn't that question answered in Hatterr? Well, I think in Hatterr, the Court certainly recognizes that benefits of all kinds can be a form of the compensation. The compensation is not strictly limited to pay, and that's why I think, frankly, one of the things that has changed since Williams was that Hatterr indicates that retirement pay is part of the compensation that is due to the judges. That doesn't make sense. That cannot be true. If Will is read, as the government is reading it here, as saying only amounts that are due and payable now are part of the compensation. You're not suggesting that the outside compensation is protected by the compensation clause, right? It might be, Your Honor. If, for instance, one could imagine a regime where Congress says, you know, we're not going to give judges any money, but the way we're going to let Article III judges earn a living is that they're going to be allowed to practice law. If that were the regime, then that couldn't be changed. They couldn't say, well, you can't practice law now, and we're still not going to give you any money. Again, that raises some interesting issues, and there always are issues about what kinds of benefits are considered to be part of compensation. At Hatterr, there was an exemption from taxes, but as Justice Scalia noted there, and the majority also noted, you have to look at the overall package. Once you start to look at the overall package, I think it's clear that you're no longer looking just at things that were due and payable, because benefits, certainly the promise of a COLA is a benefit that you get. It's true as a judge in any job, but that same is true for retirement pay. You'll say, look, come work for us. The benefits are your salary goes up every year to account for inflation. You'll get this generous retirement package. So do you think that Congress could increase the number of years required for eligibility for retirement pay for people that leave the court? I'm not talking about senior state, it's retirement. Or disability, let's say, which I think is now five years. Suppose they said five years isn't long enough for eligibility for disability. Let's make it seven. I think that raises very serious questions under the compensation clause. Again, once you accept it, as I think the Supreme Court has in Hatterr at least, that benefits like that can be part of the package. But it would be okay, for example, to increase the required workload, let's say, of senior judges. Yes, I don't think that that's a denial. Even though it's, in effect, an increase, a lowering of the per hour. You know, it may be hard to draw the line at points. And again, if you say, look, the rule is now, it's the rule of 80 now, 65 plus 15. If they change it to the rule of 90, I think that would raise very serious questions under the compensation clause. Again, because what's the point of the clause? We're protecting promises to judges. Those are promises that allow the judges, going back to what Chief Judge Rader said at the beginning about the rule of necessity. Judges have to make tough decisions. Judges shouldn't have to fear that when they make those kind of tough decisions, that Congress may say, you know something, I think that that's wrong. I don't like that Obamacare ruling. You know something, I'm going to slash judicial pay by 2%. Well, that's no different than saying, you know, judges were scheduled to get this COLA for next year. Judges were going to get it. I don't like that ruling. I'm going to take away that COLA. That's the very vice that the clause was enacted to prevent. And with all respect, we think that the Williams Court, again, read more into the will decision than needed to be read. And so we respectfully ask this court to look not so much just at the due and payable standard, which again would leave retirement pay on the chopping block, but to look at what is the reasonable expectation that is based on the level of definiteness of the promise. The Williams dissent put a lot of emphasis on this notion that the 89 Act was a bargain, or essentially was a legislative bargain where the other income was wiped out, the outside income was wiped out, or the right to earn outside income was wiped out in return for this promise of future COLA. But is that bargaining really relevant? Your Honor, I certainly think that that's relevant in the sense that it underscores what a reasonable person would believe the promise to be. In other words, I'm not sure you always would need kind of this quid pro quo, but I think it underscores the whole nature of the 1989 statutory regime as a fundamental departure from the previous regime. And so I do think that even though it may not be necessary to have kind of that bitter plus the sweet, I think it underscores that judges were reasonably entitled to expect. Either when they're sitting on the bench looking at, you know, should I stay on the job, or should I accept a general counsel offer, or if you're sitting at the kitchen table and you're pondering a judicial appointment, you and your family should say, look, I should be able to figure out, you know, I look at what Congress has said, they've said, you know, get a COLA, unless the President declares these extraordinary circumstances. That's the deal that is being offered to the judges. And again, going back to the basic point of Hamilton, that Congress should not be able to change that for the worse. What Supreme Court case says that congressional promises are reasonable expectations of the standard as opposed to the vesting rule of will? I think, as Justice Breyer pointed out in his statement, or his dissent from the denial of cert in Williams, the whole point of the compensation clause is to protect the judge's reasonable expectations. I mean, we're faced with a word... How do we know that? Well, we're faced with the word compensation. So I will give you that the Constitution isn't self-defining in terms of what the word compensation means. And the government's interpretation here is that it's only amounts that are actually due and payable. Our position is that to give effect to the intent of the framers, and what Hamilton was talking about in Federalist 79, you have to recognize that what you're doing here is you're protecting the judge's reasonable expectations. So they're not chilled in terms of having something that they are entitled to expect taken away from them. Obviously, a future salary increase that is not yet enacted into law isn't a reasonable basis for thinking you're going to get that. So you won't be... the idea, at least, is that a judge can't be reasonably chilled from exercising his or her judgment in a case based merely on the possibility of some future pay increase that's not enacted. So this comes from your reading of the Federalist Papers, not from a Supreme Court case? Well, it comes from the Constitution, which is brought to life by the Federalist Papers. And again, you don't have to take my word for it. With all respect, Your Honor, Justice Breyer, joined by Justices Scalia and Kennedy, has set forth this very point. Again, I understand that's not a majority of the Court, but they have actually set forth the path for distinguishing will. And again, they didn't say, we as a Supreme Court need to overrule will. They said will can be reasonably distinguished on these grounds. And I think that gives this Court the path to do just that. Counsel, you keep using the terms promise and reasonable expectation. But all promises can be broken. And isn't a reasonable – isn't an expectation – doesn't it become reasonable when there's some sort of vestment of an interest that has come into play? Well, Your Honor, with respect to just the premise of your question, the Compensation Clause stands for the principle that all promises can't be broken. Congress has no constitutional authority to break a promise of judicial pay. So if Congress, in fact, had said, you know, you will get – if Congress has paid you, I don't think the government even disputes that the paycheck that you're currently getting as a court of appeals judge, and I think it's $184,700 a year, that they cannot break their promise to pay you that by paying you $150,000 next year. So the question then is – and I agree with you. There is a question of vesting. But the question is – and we don't disagree with Will that it certainly does vest once it's become due and payable. The question is, is that the only circumstance when it vests? And this was a question that Will had no occasion to address because it didn't have before a precise and definite regime. If Congress says, judges, instead of giving you $20,000 extra dollars this year, we're going to give you $10,000 this year and $10,000 next year. Period. Is that any different than giving you $20,000 all in one swoop? And I would respectfully submit that from Hamilton's perspective, from the whole perspective of what on earth this clause is trying to protect, there's no constitutional difference. So that – Judge Ryan, I have to ask you a question. The vesting rule you should look at then, due and payable is not in the Constitution either. That's the government's vesting rule. What we're asking you to do is adopt the vesting rule that we would respectfully submit. It's more consistent with the intent of the framers as evidenced in the Federalist Clause. If we agree with you, we have to remand on damages, don't we? That's correct, Your Honor. And we've set forth in our brief that we think that this Court's opinion in Hatter already sets forth how the damages calculation should be performed. I see I'm eating into my rebuttal time, so with respect, I reserve that. I do have a question about the second question that was posed. Yes, Your Honor. Assuming, if it were true that we felt that Williams was right and that Will controlled, but we agreed with you that Section 140 is either not operative or unconstitutional, then what impact is that on the 2007 and 2010 withholding of COLAs, given that there was no blocking statute? Then it seems to me that at least you should remand for us to proceed on a claim for those two years, for the COLAs, for those two years. Because that is really independent of the Will slash Williams point. And just to clarify, we have both a statutory and a constitutional challenge to the 2001 statute. Do you believe those are discriminatory? Well, with respect to the constitutional argument, yes, that's the basis of it. With respect to the statutory argument, just to make this point clear, and this was fleshed out more in the amicus brief of the Federal Judges Association than in our brief, the 2001 statute just says the 1981 statute comes back to life. It didn't actually reenact the 1981 statute. It just amended the 1981 statute and actually refers back to 1981. So what that statute did is says that except that here and after it acted, you need a specific authorization by Congress. It's quite clear, and I think both this court in Williams recognized this and Justice Breyer's opinion in Williams and the Supreme Court, that the 1989 statute is a statute here and after it acted with respect to 1981, and therefore in the COLAs in the 90s, Congress affirmatively blocked them. But that's not true in 2007 and 2010. So even under the language of the 2001 statute, even if it is constitutional, it doesn't purport to block anything. So we should have gotten the COLAs in 2007 and 2010. And then there's also an argument that even if you disagree with that statutory interpretation, that the 2001 statute is unconstitutional. The difference is, and the reason that we respectfully submit you should reach the constitutional question, that there's also claims for damages in the earlier years of the six-year statute of limitations period, which in this case goes back to 2003, arising from each paycheck we were getting in those periods was artificially lowered as a result of the denial of COLAs in the 1990s. And we obviously are not going back all the way to the 1990s. We can't do that with respect to the statute of limitations. But this goes back to the point, I think, that Judge Lurie was asking me about in terms of the damages calculation in Hatter that the court made it clear that each denial, each paycheck is an individual violation of the compensation clause. So we should be able to go back for the periods in 2003, 2004, 2005, and 2006. And that is not answered just with respect to the 2001 statute. The specific claim that you alluded to that's discussed in the amicus brief in the Federal Judges Association, was that claim raised by you in the trial court? Your Honor, our complaint talks about the withholding of the salary in those years. Certainly, I think our complaint can be fairly read to encompass that claim, and at the very least we should be given a chance to amend our complaint to make clear that we're doing a statutory complaint. A statutory claim under Rule 8, all you need is a plain and straightforward basis of the facts underlying the claims. You don't have to go into detail on your legal theory. If I could reserve the balance of my time. Thank you, Mr. Landau. Mr. Simpkins. May it please the Court. The Court of Federal Claims judgment of dismissal should be affirmed. Your Honors, we would submit that the arguments presented by all the parties here, including Amici, are many and varied, but we agree with Mr. Landau that this case ultimately reduces to a relatively simple and straightforward issue, and that is whether this Court in Williams correctly concluded that the vesting rule set forth by the Court in Will controls this case. If it does, then the judgment should be affirmed. And on that issue, the question simply reduces to whether the plaintiffs have persuasively distinguished this case from Will and, in particular, the statutory pay schemes that were considered by this Court in Williams and the Supreme Court in Will. We would submit, Your Honors, that there is no material distinction between the two pay schemes. Of course, the plaintiffs have characterized the scheme in Will as being entirely discretionary, whereas the scheme created by or amended by the 1989 Act is, in the plaintiff's characterization, entirely nondiscretionary, self-executing, precise, and definite. We would submit, again, Your Honors, that those characterizations, and they're simply characterizations of counsel, don't hold merit when the specifics of the two schemes are compared. Under both schemes, adjustments, future adjustments in judicial salaries were expressed in mandatory automatic terms. Both schemes require, they use the word, shall be adjusted to the rates of pay. Moreover, under both schemes, those adjustments were to be made at a date certain in the future. Also, under both systems, the increases to judicial pay were keyed or tied to increases in the general schedule salaries. Wasn't there a qualitative component to the scheme in Will, though? I mean, there was no guarantee that there would even be a recommendation for increases, whereas a scheme under the 1989 Act is automatic. No, Your Honor, I would respectfully disagree. Under the old scheme, the president's pay agent was required to prepare and submit a report. To make a recommendation, but it didn't say that it had to recommend any increase. Well, if in his study and compilation of the surveys of the Bureau of Labor Statistics, if it was concluded that there was no basis for an increase in a particular year, I suppose that could be true, but it could also be true under the modern system where the ECI in any year conceivably could reflect no change. So, the essential point is that under both systems, some adjustment had to be made unless the president stepped in under his special authority to reduce or deny an increase altogether based on national emergency or economic conditions affecting the general welfare. And again, the third point is that exception of the president's alternative pay plan exists under both schemes. So, what we have here is a scheme that is substantially identical in terms of the mandatory nature of the adjustments. The fact that both schemes require the adjustments to be effective as of a date certain in the future, the similar trait that both judicial pay raises and GS pay raises are tied together, and finally, the notion that the president could step in for the stated grounds. It seems to me that under the Will system that Congress retained a discretion to step in along with the president and to change and to make adjustments, but that wasn't the case under the 89 system. It seems to me that Congress wrote itself out of that scheme. Is that correct? Not entirely, your honor. Under the Will scheme, Congress, well as a general matter, Congress always has a lurking power to step in and make changes under the Supreme Court's decision of Will. But under the specific provisions of the Will scheme, Congress really didn't play a role unless and until the president stepped in and decided to present an alternative pay plan. And then Congress had 30 days, either house of Congress could essentially veto that plan. And in the case of that occurring, then the president's pay agent proposal would govern. So Congress didn't play an active role under the old system. But those functions that you just described were not included under the 89 system. No, there's not that sort of detailed system back and forth, no. But again, Congress could always conceivably, under the rule of Will, step in and change the president's alternate pay plan. But if Congress didn't include itself under the 89 system, shouldn't we view that system as more automatic than, say, the Will system? No, Your Honor. The Supreme Court in Will regarded the old system as being automatic. The Court's decision is replete with references to the automatic nature of the pay increases there under. And again, replete with references to legislative history behind the blocking statutes that the Court was considering, which were done to prevent automatic pay increases from going into effect. So automatic means automatic. It means that unless some party intervenes, they are required to go into effect by a date certain. Mr. Simkin, in 1989, before the Ethics Reform Act went into effect, could the judges have stepped in, the then sitting judges, and have sought a prohibitory injunction against enforcement of the ban against outside income, for example? An injunction against... Could they have taken action to keep it from going into effect? Well, I'm not aware of any ground. There wouldn't be a ground under the Compensation Clause, for example, to do so. I'm asking, could they have legitimately sought a prohibitory injunction? I'm not aware of a ground under the clause. Under the rules. Under the rules, could they have sought a prohibitory injunction at that point before it went into effect? Of course they could seek an injunction, but I'm not aware of any basis upon which they could prevail upon such an injunction. The distinction I'm drawing is that after it went into effect, it's much harder. They'd have to seek a mandatory injunction. Presumably that's the case, Your Honor. Thank you. With respect to the issue of retirement pay, which you allude to, I think, at pages 33 and 34 of your brief, and the appellants come back and say that your discussion of that as deferred compensation gets you into hot water with respect to COLAs. Why is retirement pay deferred compensation, or is that your position? Well, that was the position articulated by the Solicitor General in the willed opposition. Right, and it's the position sort of articulated in your brief, but I'm not sure it was firmly adhered to. Is that your position? Well, that was the position of the Solicitor General. We certainly have no basis to depart from it here. So you're saying that either a congressional change to the amount of retirement pay, retirement in this sense being after someone leaves the judiciary, that either a change in the amount of the pay or even a change in the number of years required for eligibility for ultimate retirement pay would be a compensation clause problem? I don't think I can respond so generally to that question. Well, I can give you specifics if that would help, but I mean, suppose that they say instead of getting what everybody else gets, because you're going outside and you have an opportunity for other income, if you leave before the age of 70, you'll get half of what everybody else gets. That would be a compensation problem with respect to everyone in the judiciary? Is that your position? Well, of course we haven't taken a position, but as Mr. No, I thought that's what you said in your brief, but maybe you didn't. Right, well, those portions of our brief were simply responding to the argument that this Court's decision in will somehow threatens or opposes a risk to a diminishment of retired pay. Well, it does, based on your reading of what vesting means, doesn't it? Because, I mean, you could have a judge that went on the bench in their 30s who is on the bench for 30 years but leaves at age 64 and a half and gets zero because it's not due and payable until the rule of 80 is satisfied. So, under your reading of will, by definition, it would put at risk the retirement pay for every single currently sitting judge, wouldn't it? Not necessarily, Your Honor, no. As Mr. Landau noted, in Hatter, the Court indicated that retirement pension benefits are part of the compensation. So, just on that point alone, it presents a different issue. And, of course, the Court in Hatter made that point by also citing to and harmonizing its decision in will. So, what will and Hatter mean with respect to compensation and how it's protected, I suppose, is for a future case. But, our reading, and essentially, it's not necessarily our reading, but this Court's reading of will in Williams doesn't pose a threat to retired pay because the Court was looking to, number one, different statutory provisions that set out salary increases, not retired pay. Did you speak when you said what will and Hatter mean to compensation? You meant to say retirement. Retirement pay, yes. But, more importantly, in Williams and will, the Courts were guided by the history behind the compensation clause and how the specific issue of pay increases was raised and addressed by the framers. We don't have any similar evidence here respecting pensions, for example. So, you're saying that some compensation can be taken away, but other compensations can't be? No, no, Your Honor. I'm just saying that it's a different issue. Either way, if you're saying due and payable is the test, it's got to be due and payable, right? Well, due and payable based upon current service, and we've drawn, reiterated that distinction. But, I mean, again, are you standing behind your argument that the retirement pay is deferred compensation when it's not due and payable until the rule of 80 is satisfied? Well, we're noting that it can be likened to deferred compensation. I mean, it certainly was in your brief. I'm saying are you standing behind that as a valid distinction? We certainly are not departing from that, no, Your Honor. But, again, getting back to what we believe is the dispositive issue, and that is whether the two schemes are distinguishable. Now, as we understand it, the plaintiffs simply haven't pointed to a particular provision made by the 89 Act that makes the 89 Act scheme any more precise or definite than the old scheme. They seem to rely, in their reply, very heavily on the fact that the provision respecting judicial pay increases, Section 461, states that rates of pay shall be adjusted. But, as we pointed out in our brief, and as they have not responded to, that language, shall be adjusted, originated not from the 1989 Act, but from the original 1979-1975 Adjustment Act. Again, the two systems were materially similar in all respects for purposes of this course consideration. In Year 3 in Hatter, is it not the case that there was a specific number established before the blocking statute on August 31, 1995, by an alternative plan submitted by the President? The number in Year 3 in Will had been established. There was a precise number at the time of the blocking statute. Yes, Your Honor. In one of the years in Will, the President did come in with an alternative plan. I believe it was Year 3. It was a precise number. Yes. Which, again, there is no indication in the Supreme Court's analysis in Will that a pay increase or a proposed increase would be irrevocable if it was non-discretionary in some respect. It was simply a matter of timing under the Will's Court's decision. And so, there is no material distinction on the facts between this case and Will. And as Your Honor, Judge Sykes noted, really there is no basis here to attempt to distinguish the two cases on the facts. In many respects, this case is very similar to the Hatter case in which the court was presented with existing Supreme Court precedent, Evans v. Gould, which held, with respect to income tax assessment, that such diminutions were unconstitutional. That was a criticized decision. It was called into question in some later respects by subsequent decisions. But this court was presented with it and had to apply it. On appeal to the Supreme Court, the Supreme Court commended this court for following existing precedent, noting, of course, that it was only the court that could overrule one of its cases, but then proceeded to hold that Evans was no longer good law and overruled it. That's essentially the position we would submit plaintiffs are in. They're faced with a controlling Supreme Court precedent, and if it is to be distinguished or a different rule is to be applied, or if it's reversed altogether, that's really something for the Supreme Court to determine. You were talking about distinguishing these cases on their facts, but the Congress wrote the 89 Act with the Will case in mind, and it was trying to get away from the opinion that gave rise to Will and the politics that went into living with it for ten years after Will. Why is that? That's interpreting a totally different statutory scheme. It's not distinguishing cases on the facts. It's two different schemes starting all over again. Congress must have thought that they would want something different than the one that Will dealt with. Well, Congress did three things with respect to compensation in the 89 Act. Of course, it gave a one-time 25% pay increase. It restored two previously denied COLAs in fiscal years 89 and 90, and then it changed the method of calculating COLAs from the old report system to the ECI system. With respect to, of course, the first two, there was no notion that it was attempting to get around or deal with Will at all, and even with respect to the change to the ECI method, there's no indication that that was a response to the court's decision in Will. It's unclear whether the plaintiffs are relying on some sort of quid pro quo or contract. Mr. Lanois seemed to say they weren't at least directly relying on that. Well, I'm referring to what Congress thought, and they thought they were getting out of this business because they'd been dealing with it year after year after year. It was as distasteful for them as it was for the judges, and everybody else who had to go hand in hand every year. They thought they were setting something up. We were all there. Most of us were there at the time, so we know what they were trying to do. You're telling us they failed. Well, I wouldn't say they failed, but I would refer the court back to the— You changed their mind as your position, and they were entitled to it as your further position. It's not really a change of position. As the majority panel in Williams described, Congress wanted to create an automatic system of pay raises in 1975. There's no doubt about that. Just as it desired to continue to do that in 1989, the fact of the matter is it didn't change it enough to take it out from the rule of will in 1989. Simply changing the method of calculating the increase doesn't change the essential aspects of the scheme itself that the court in will found controlling. Counsel, we received a lot of information, especially from the amicus briefs, that any diminution in the compensation of the federal judges puts at risk the impartiality and the independence of the federal judiciary. Of course, that invokes the doctrine of separation of powers. What's your response to those comments? Well, of course, in general, that's true. That was the purpose that the compensation clause was created, to provide a measure of security against threats to judicial independence. But as the court in will described in depth, and this court in Williams acknowledged, the framers grappled with the question of judicial pay increases. Of course, compensation was protected against diminution, but as far as increases to that compensation, that presented a problem to the framers. And ultimately, the compromise was to accept some degree of risk to encroachment on judicial independence by the Congress, in exchange for the benefits afforded by having judicial salaries increased when times warranted. So the clause itself embodies some acknowledged risk to independence. There was criticisms in the debates by the framers that allowing Congress to pass upon increases would cause judges to curry favor with Congress while those pay increases were being considered. But nevertheless, that was ultimately the compromise that was reached, and that was the compromise that the court recognized in will and indeed drove it to decision. Mr. Simpkin, on page 21 of your response brief, you say that the compensation clause doesn't prohibit Congress from changing the rate of future increase or canceling it, quote, before judges have performed services for which compensation is due and payable. And the problem I have with that is, who gets to define what services are? Isn't it at least a view that the services a judge performs is going on the bench and being a judge? Because otherwise, doesn't Congress get to say, well, geez, we've looked at what you did last year, and you know those weren't very good opinions, so they don't constitute services. And then you're running up against a load of law. Well, Your Honor, I think the portion of our brief where we've referenced provision of services, we were simply tying back, we might not have been so precise, we were tying back to the rule of will. It's in your summary of your argument as well. Yes. But what it simply refers back to is the Supreme Court's treatment of that issue in will, that services rendered beginning on the first calendar day of the period. At 12.01 a.m. on January 1st, services begin even if the judge isn't at work. Yes. We've certainly not taken the position that a judge has to be up and performing some function. But under that theory, though, then couldn't Congress decide to drop the salary rate as long as they did it before 12.01 on January 1st? No. In other words, your annual salary is $184,000. Couldn't Congress say, you know what, starting next January 1st, the annual salary is $170,000? No, not at all, Your Honor. Why not? It's not due and payable yet, is it? Well, it was part of the compensation due and payable to the judge in that prior year, that base salary of whatever level it was. If Congress in any year says the salaries of the federal judges shall be $180,000 per year, the next year, of course, no one is saying Congress can come back and take that down. And the reason it can't take that down is because that salary level had become the compensation that was due and payable to the judges. It can't go back. And, of course, the whole point of Will is that for future increases, as opposed to base salary levels, for future increases, those have not become part of the compensation due and payable. What about the fact that the Boehner Court essentially said that once the COLA, once the system, the law passed in 89 and the system was put in place, that all of those later COLAs were completely automatic and they didn't constitute additional raises. They actually just constituted an automatic application of the 89 Act. Do we have a different rule of vesting for the 27th Amendment than we do for the compensation clause? Well, as this Court in Williams addressed that issue, yes, it was a different issue. The Court was looking to when pay raises took effect for purposes of the 27th Amendment and held that that was a different issue from the issue addressed by the Supreme Court in Will. Of course, if there's a contention or conflict between those two cases, the Court's decision in Will, of course, would be controlling. Could I ask you about the 2007-2010 claim raised in the amicus brief that was alluded to earlier? That issue entirely turns, I take it, on whether Congress in 2001, when it amended Section 140, was amending it in a way that converted the hereafter enacted into something that had to happen each year as opposed to the hereafter enacted referring to any act that occurred after 1981. Is that a fair statement of what you understand the distinction to be? Well, at least from our perspective, that's not really an issue. We would agree for purposes of argument that the hereafter point in time is 1981. Well, but if it's 1981 and if we conclude that the 1989 statute was hereafter enacted, and I understand you have arguments as to why that's not true, but if we were to accept that, then you need for the reading of the amendment to Section 140, I take it, to mean that hereafter enacted applies each year, right? In other words, that an act has to be passed authorizing the increase each year, or 140 will keep it from going into effect. The amicus brief says no, it's the 1989 that's hereafter because it was after 1981, and that's the date noted in Section 140 both as originally written and as amended. It didn't change the date from 1981. What's your answer to that? Well, again, we would agree for purposes of argument that the reference point is 1981, and therefore the 89 Act could, in theory, be a law hereafter enacted, but as we've argued in our brief, it simply couldn't be construed in that fashion because tellingly, Your Honor, the 1989 Act itself cites to and references Section 140, and with respect to the restored COLAs in 1989 and 1990, specifically authorized those but did not do so for any others. There's no blocking legislation in 2007 and 2010, right? That's correct. So if, in fact, we construe Section 140 as not interfering with the Williams holding that the 1989 legislation was here and after enacted legislation, what's the basis for denying the COLAs in 2007 and 2010? Well, there would not be. I suppose there would be inaction by Congress, and that would, in theory, trigger the automatic increase. You've just conceded a partial victory for the judges, am I right? I'm sorry, Your Honor? You've just conceded a partial victory for the judges? Well, not necessarily, Your Honor. If Congress, through inaction, fails to provide an increase required by law, that's not necessarily the same as a direct diminution. In other words, it's not a law that mandates a reduction in the salary level. But just as a statutory matter, under the Williams interpretation of Section 140, why are the judges not entitled to the 2007 and 2010 COLAs? Well, the Williams decision didn't address the 2001 amendment. Well, but you say that that just changed the result with respect to the continued operation of the statute, which was one of the grounds in this. Williams said, we construe 140 quite apart from the question of whether it was continuing legislation to encompass the 1989 legislation, and that was legislation here and after enacted within the meaning of 140. Accepting that interpretation in Williams, is it not the case that the 2007 and 2010 COLAs were improperly denied since there was no change? Well, the decision in Williams didn't specifically address the question of specific authorization. It held that the two statutes were in conflict with one another. Let me put it this way. If 140 is here and after enacted legislation, if the 1989 Ethics Reform Act within the meaning of 140 is here and after enacted legislation, then it is the case that the 2007 and 2010 COLAs were improperly denied, isn't it? Yes, that would be the case, your honor. If there was an automatic right to them and there was no action either by the President or Congress, we would say yes. So you are not arguing then that the 2001 amendment to section 140 placed section 140 as a bar to any automatic increases, any automatic COLAs for judges in each year thereafter. As I understand it, the language of the statute is admittedly somewhat murky, but looking at the language of the conference committee, it says it makes a permanent provision that prohibits the use of funds to increase the salary of a federal judge, except as may be specifically authorized by the act of Congress. You are not arguing that that language, to the extent that it reflects the meaning of the statute, imposes a bar to the automatic increases even in the absence of specific barring legislation in a given year. Is that right? Well, we have argued that section 140 was effective from the date of its enactment to this day. Again, the court in Williams disagreed with that interpretation, but in our view that is the proper interpretation. So in that sense, yes, 140 was effective in each year and would require... So the effect of that argument... Yes, one follow-up question if I may, Chief. Sure. So if we will assume, there is nothing much to indicate this, but if we assume that the 2001 amendment to 140 was effective in response to that portion of the Williams decision that discussed 140 for attempting to say, well, no, we are going to make it permanent, even though the federal circuit doesn't think it is, then you think 140 would block automatic COLAs even in the absence of specific year-to-year blocking legislation. Is that correct? I would say that could be an interpretation because 140 provides, notwithstanding any other law... Is it your position? Yes. Okay. Thank you, Mr. Simpkin. Okay, Your Honor. Your time has expired. Do you have any final thoughts? I don't, Your Honor. My time has expired, so I would simply conclude my argument. Thank you. I would like to ask further questions. Mr. Landau. Thank you, Your Honor. I would like to make three quick points on rebuttal, if I might. First, counsel's fundamental submission to this court is that the scheme post-1989 is materially indistinguishable from the scheme pre-1989. And I would just urge this court to actually go back and look at 5 U.S.C. 5303 as enacted in 1975, or 5 U.S.C. 5305, excuse me, as enacted in 1975. That was the provision of law that governed GS COLAS under the regime that was at issue in Will. It is interesting, if you look at the U.S. report, that provision occupies about ten pages. It is incredibly complex in terms of how COLAS could ever come to be. The president has to appoint an agent. There is no discretion. It doesn't say the agent shall presumably give a COLA. The agent just has to go through a lot of process. The agent has to compare the rates, but it doesn't say and shall grant it. It just says the agent shall prepare a recommendation. It doesn't limit the agent's discretion. It says the agent shall convene a federal employee's pay council. There are a lot of steps, but at the end of the day, there is no there there in terms of what substantively has to happen. Then, not only the agent… In year three in Will, there was a specific number at the time of the blocking legislation, right? Oh, sure, Your Honor, because it happened in that year that that process wound up with a COLA for GS employees. But that doesn't mean that just because it wound up happening that way that you were entitled to a reasonable expectation that it would. You could have had a scheme that said you will get a COLA if you flip a coin and it comes out a certain way. It might come out that it actually came out heads, right? But that doesn't mean that you would have a definite promise of a COLA under those circumstances. So even though this Rube Goldberg process did yield a result… Before the blocking legislation. Yes, Your Honor, exactly. But again, GS employees got those COLAs there, but the point is that whole scheme was so precise and indefinite, whereas now the regime is precise in terms of… Well, just to finish the regime, you had the agent, then you had a commission, then you had the president. Interestingly, this was a 1975 statute, and it kind of shows the post-Watergate world they were living in. Of all the pieces of this process, there's four sets. The agent, the commission, the president, and Congress. Only the president's discretion was substantively cabined through that 1975 legislation. The president could only change the recommendations if there were a national emergency or serious economic conditions affecting general welfare. Everybody else had unbridled discretion, including Congress, going back to Judge Reyna's question, which could exercise a one-house legislative veto under this. So under that circumstance, there was no basis for giving rise to any reasonable expectations. And again, I urge you just to go through the statute. It's such a complicated Rube Goldberg mechanism, again, with no presumptions, no guidelines. And then going back to the point that Judge Miller was making before, the 1989 act was a repudiation of this regime. There were extensive studies done. The system is broken. It is not working. We can't have this system where everybody has to go back to Congress year after year. Let's just put these restrictions in place, make these COLAs automatic, and everybody goes on their way. And that's the promise that was broken after 1989, and that's the promise that we're here to restore. So it's a fundamentally different regime. And again, the 1989 act, I think there was a question raised about the Boehner case. If you interpret the 1989 act to be kind of discretionary and open-ended, as opposing counsel suggests, then Boehner makes no sense, and you have different rules regarding what the system was for members of Congress versus judges. And again, the 1989 act established a precise amount. It says ECI minus 0.5%. There was no question about this. Whereas under the old regime, judges would get whatever pay increases the GS employees might have happened to get. And to be sure, by the end of the process, it sometimes produced a precise amount. But that doesn't mean that ex ante judges could form any reasonable expectations that that's where the process would wind up, especially when you had a legislative veto. The second point I wanted to—oop, I'm almost out of time. Just on retirement pay, I think the discussion with Judge O'Malley was just dead on in terms of their theory will put retirement pay on the chopping block. They have no way of squaring their theory that the amounts have to be due and payable with a theory that would say that retirement pay is constitutionally protected. They're both—COLAs and retirement pay are a form of compensation for current services, but they're not currently due and payable yet. And that's just the way all benefits are. And they're all within the scope of the compensation clause. I see my time is up. You had a third point. I did. If you would indulge me to make it very quickly, I just wanted to deal with the 2001 statute, and I thought the answers were a little bit confusing on the other side. I thought they were conceding, and I think they did concede, that the 2001 statute, if you look at it, they could have reenacted the whole 1981 statute in 2001, but they didn't do that. All they said, this is the 2001 statute in its entirety. This section, and they're amending the 1981 statute. They said this section shall apply to fiscal year 1981. So it's a reference to 1981. They knew what they were doing. And each fiscal year thereafter. They didn't say hereafter as in 2001. They said we're amending the 81 statute, which always had the reference to hereafter. 89 is obviously after 2001. And as the panel concluded in Williams, and we agree with the Williams panel on this point, that 81 is after 2009. So there is no, since there was no blocking legislation, there was no basis for Congress to withhold the COLAs in 2007 and 2010. And therefore, at a very minimum, we're entitled to those COLAs as a statutory matter. Thank you, John. Thank you, Mr. Blanton. That concludes our proceedings. All rise.